IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Chiquita B.[1] o/b/o D.B., a minor, | |
| Plaintiff, | |
| v. | Case No. 19-cv-8316 |
| Kilolo Kijakazi,[2] Acting Commissioner of Social Security, | Honorable LaShonda A. Hunt |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Chiquita B., on behalf of her minor son, D.B., appeals the decision of the Commissioner of Social Security (Commissioner) denying D.B.'s application for Supplemental Security Income (SSI) disability benefits. For the following reasons, Plaintiff's motion for summary judgment [24] is granted, the Commissioner's motion for summary judgment [31] is denied, and this case is remanded to the agency for further proceedings consistent with this opinion.

**BACKGROUND**

**I.     Procedural History**

On December 5, 2016, Chiquita filed an application for disability benefits for her minor child, D.B., alleging an onset date of September 1, 2011. (R. at 149). The claim was denied initially and on reconsideration. (R. at 86-93). Chiquita requested a hearing which took place on

---

[1] Pursuant to Internal Operating Procedure 22, the Court will identify the non-government party by using her full first name and the first initial of her last name.

[2] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Acting Commissioner Kijakazi as the named defendant.

August 15, 2018, before Administrative Law Judge (ALJ) Laurie Wardell. (R. at 36-58). D.B. was represented by counsel at the administrative hearing, where both he and Chiquita testified. (R. at 36-58). The ALJ found that D.B. was not disabled and denied his application. (R. at 14-35). Chiquita sought an appeal of the ALJ's decision with the Appeals Council, but her request for review was denied. As such, the ALJ's decision is the final decision of the Commissioner. (R. at 1). Chiquita timely appealed to this Court [1].

## II.  Factual History

D.B. was born on February 15, 2009. By first grade, his elementary school determined he needed an Individual Education Plan (IEP) to address specific concerns relating to his academic and behavioral development. (R. at 247-73). The first IEP dated April 2016 described D.B. as having a developmental delay but being a "friendly, social student who is well liked by his peers." (R. at 247). At that time, he was able to identify only ten sight words and was "far below grade level" for Reading. (R. at 250-51). On the NWEA, a district-wide test, he placed in the 4th percentile in Math as compared with his peers. (R. at 251). The IEP team recommended that D.B. receive 650 minutes per week of direct services in a separate special education classroom and that all directions would be read aloud, and tests administered orally while also giving him stop-the-clock breaks. (R. at 256, 265).

Chiquita applied for SSI on D.B.'s behalf in December 2016. His special education teacher, Julienne O'Hara-Fisher, completed a teacher questionnaire in January 2017. Although D.B. was in second grade, O'Hara-Fisher reported that he was "reading at a kindergarten level" and needed "adult support throughout the school day … to comprehend material and support in the completion of academic tasks." (R. at 181). She noted serious problems in three domains of functioning as well as an obvious problem expressing anger and handling frustration appropriately. (R. at 183).

Next, in February 2017, as part of the SSI application process, D.B. saw a psychologist who assessed D.B.'s IQ using the Wechsler Intelligence Scale for Children-IV (WISC-IV). (R. at 319). The psychologist found D.B.'s full-scale IQ score to be 85—in the low average range of intellectual functioning. (R. at 319). The report noted that an "overall estimate of his intellectual ability cannot be interpreted meaningfully however because he displayed too much variability in the four indexes." (R. at 320). The psychologist also concluded that D.B. "does not exhibit any behavioral problems at home or at school" (R. at 320), but she did not explain the basis for that conclusion. The record does reflect that Chiquita had completed a function report a month earlier in January 2017 where she checked the box indicating that D.B.'s impairments did not affect his behavior around other people. (R. at 172). D.B.'s records were further reviewed by state agency medical consultants in March 2017; they determined D.B. was not disabled. (R. at 63-67, 69-78).

In February 2018, D.B. underwent a behavior health assessment at Ada S. McKinley Community Services. (R. at 350-371). The report noted that D.B. presented with hyperactivity and emotional difficulties including angry outbursts and impulse control problems. (R. at 353). D.B. was described as "almost never" assisting in managing difficult situations or problem solving. (R. at 356). Both Chiquita and D.B. reported that he struggled with "following directions, anger management, [and] impulsivity" and had "angry outbursts" at school. (R. at 357, 360). D.B. reported "almost never" being able to accept adult correction without "arguing and temper outbursts" and that he "almost never" made and kept same age friends. (R. at 361). The report reflected that Chiquita "had concerns for [D.B.]'s behavior since he entered school." (R. at 367). D.B. was diagnosed with disruptive mood dysregulation disorder (DMDD) and attention deficit hyperactivity disorder (ADHD). (R. at 370). D.B. was also given a Global Assessment of

Functioning (GAF) score of 45 indicating serious impairment. (R. at 367). By early April 2018, D.B. was taking methylphenidate and Guanfacine twice a day to treat these disorders. (R. at 341).

D.B.'s IEP was updated in May 2018. (R. at 373-404). The beginning of the IEP described D.B. as a "silly, energetic student" who loves Math and does best when he is able to work towards rewards. (R. at 375). By then, D.B. was at the end of third grade but "reading at a level consistent with a beginning of year – first grade student" and requiring "significant instructional support." (R. at 376). His NWEA score placed him in the bottom 1st percentile range in Reading and the bottom 11th percentile range in Math. (R. at 377). The IEP noted that D.B. needed "expectations reviewed before every activity" and his off-task behaviors included fidgeting, making noises, talking to peers, and "getting into physical or verbal arguments/altercations with his peers." (R. at 377). D.B. needed to have his desk moved away from other students as "[w]ithout reminders[,] he [would] scoot his chair towards other students and lean into their learning space." (R. at 377). Furthermore, during transitions, D.B. needed "explicit directions, eye contact from his teacher, and gestural prompts to remain silent, keep his backpack on his back, and keep his hands and his feet to himself." (R. at 378). Even with this support, "if [D.B.] gets frustrated with another student close to him, he will kick or hit the other student." (R. at 378).

The IEP team determined that D.B. needed support in transitions, reinforcing interpersonal communication, reinforcing teacher instructions, reviewing directions, and completing tasks. (R. at 380). Some of the accommodations put into place included: giving verbal instructions in clear steps; providing extra examples; explaining directions and giving concrete examples; checking for accuracy and behavior every five minutes; providing verbal rewards daily; shortened tasks; and extra breaks. (R. at 382). While the IEP states that D.B. "is with non-disabled peers for all other academic subject areas [except social studies]" the IEP also notes that D.B. will be "removed from

general education classroom for special education or related services: 50%" of the time receiving 1200 minutes per week total in direct services. (R. at 399). Finally, the IEP provides that D.B. will "not be held to the same percentage rankings as his non-disabled peers." (R. at 401).

Shortly after the new IEP was put in place, D.B.'s special education teacher O'Hara-Fisher completed a second teacher questionnaire in June 2018. (R. at 331-38). O'Hara-Fisher reported that she saw D.B. the majority of school days for roughly five hours per day. (R. at 331). She further stated that D.B. "requires paraprofessional support and a smaller student/teacher ratio to regulate his behavior in the separate class setting" and "is highly distractable and distracts others constantly." (R. at 332). The paraprofessional support was necessary because D.B. "need[ed] expectations reviewed daily" and "often [got] into fights." (R. at 334). O'Hara-Fisher also described how D.B. "will start to cry or walk out of the room if he gets frustrated with academic tasks." (R. 336). She rated D.B. as having serious problems in acquiring and using information, attending and completing tasks, very serious problems in interacting and relating with others and caring for himself and no problems in moving about and manipulating objects. (R. at 332-36). O'Hara-Fisher did express that D.B. was "calmer, less hyperactive" after taking his medication. (R. at 337).

Even though progress notes from McKinley indicate that D.B. was no longer available for his scheduled therapy session in April 2018 (R. at 349), an individual treatment plan was completed for D.B. in July 2018. (R. at 405-11). According to that plan, D.B. was still having difficulty controlling his anger and wanted to improve his coping skills. (R. at 405). Treatment was to involve counseling services, medication training and monitoring, and case management services. (R. at 405-08).

After D.B.'s application was rejected, Chiquita requested a hearing before an ALJ. (R. at 38-58). In August 2018, the ALJ heard testimony from D.B. and Chiquita (R. at 38-58). D.B. revealed that he did not have any friends, he was sad about going back to school, and he had spent most of his break playing a video game. (R. at 40). D.B. expressed that he could get himself dressed for school and do basic hygienic activities like showering and brushing his teeth by himself. (R. at 41).

Chiquita provided details on D.B.'s behavior at school before the medication and after medication, and generally how he acted at home. She described receiving almost daily calls from the school about D.B.'s behavior before he started medication and fewer calls after he went on medication. (R. at 43). Chiquita explained that, at first, she was only giving D.B. a half-dose in the morning, as one of her other children had previously had an adverse reaction to similar medication, but after the school reported the medication was wearing off by midday, she began to give him a second dose in the afternoon. (R. at 45-46). After beginning the second dose, the calls from school decreased; however, Chiquita said the school told her D.B. still had a problem with aggression. (R. at 52).

Chiquita further testified that at home, D.B. struggled to focus on his favorite video game, becoming upset after less than thirty minutes. (R. at 51). When Chiquita would ask him to complete chores, like picking up couch cushions, D.B. would begin the task but not finish. (R. at 49). D.B. would scream at home to the point where the landlord threatened to terminate their lease until Chiquita told him she had a disabled child. (R. at 57). In response to the ALJ questioning whether D.B. was receiving any counseling, Chiquita stated D.B. previously had one counseling session through McKinley but that therapist had been unable to continue and a new therapist had not been assigned. (R. at 53). Chiquita admitted she had not sought a therapist earlier because she

"didn't want to believe that it had touched [her] third child" but she eventually came to understand D.B.'s needs. (R. at 54).

### III. ALJ Opinion

The ALJ issued an unfavorable decision in November 2018. (R. at 14-35). She found that while D.B. did have severe impairments in the form of specific learning disabilities (ADHD and mood dysregulation), these impairments did not meet, medically equal, or functionally equal the listings. (R. at 20). This determination was based on an evaluation of "how the child functions in all settings and at all times, as compared to other children the same age who do not have impairments." (R. at 21). The ALJ considered the following evidence: (1) the hearing testimony of D.B. and Chiquita; (2) D.B.'s IEPs from April 2016 and May 2018; (3) the February 2017 psychological consultation; (4) O'Hara-Fisher's questionnaires from January 2017 and June 2018; and (5) the progress notes from 2018 for D.B.'s treatment at McKinley. (R. at 22-24). The ALJ gave partial weight to O'Hara-Fisher's questionnaires because the teacher "provide[d] detailed explanations in support of her opinions of the claimant's limitations," but there were "discrepancies between the two questionnaires that render them worthy of less weight." (R. at 25). In addition, little weight was given to the Global Assessment of Functioning completed at McKinley or the opinions of the state agency consultants as they were not consistent with the record. (R. at 25).

The ALJ found that D.B. had a marked limitation in the domain of acquiring and using information; less than marked limitations in the domains of attending and completing tasks, interacting and relating with others, and caring for yourself; and no limitation in moving about and manipulating objects or health and physical well-being. (R. at 26-31). Consequently, she ruled that D.B. "does not have an impairment or combination of impairments that meets or medically

equals the severity of one of the listed impairments" nor did he "have an impairment or combination of impairments that functionally equals the severity of the listings," and therefore, was not disabled. (R. at 20).

## SOCIAL SECURITY REGULATIONS AND STANDARD OF REVIEW

The Social Security Administration created a three-step analysis to determine whether a child under the age of 18 is disabled. 20 C.F.R. § 416.924. First, the minor claimant must not be engaged in substantial gainful activity. *Id*. Substantial gainful activity is work that involves "significant physical or mental activities" usually done for "pay or profit." 20 C.F.R § 416.972. Second, if the claimant has not engaged in substantial gainful activity, they must have a medically determinable impairment that is "severe" or a combination of impairments that are "severe." 20 C.F.R. § 416.924(c). An impairment is not severe if it causes "no more than minimal functional limitations." *Id*. Third, the severe impairment "must meet, medically equal, or functionally equal the listings." 20 C.F.R. § 416.924(d). The "listings" refer to 20 C.F.R., Subpart P, Appendix 1, which describes various criteria for different impairments that, if met, will satisfy that the claimant is disabled.

At this third step, if the claimant does not meet or medically equal the listings, all a claimant's impairments are taken into consideration, even those that are not severe, to determine if cumulatively they functionally equal the listings. 20 C.F.R. 416.923(c). To determine whether a claimant's impairments functionally equal the listings, six domains of functionality are examined. 20 C.F.R. 416.926a(b). These domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *Id*. A

claimant's impairments must result in "marked" limitations in two domains or an "extreme" limitation in one domain to functionally equal the listings. 20 C.F.R. 416.926a(d).

A limitation is marked if it "interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. 416.926a(e). This limitation can be seen from one activity being seriously limited or a cumulative effect on several activities. *Id*. An extreme limitation will be found if the impairment "interferes very seriously with your ability to independently initiate, sustain, or complete activities." *Id*. While an extreme limitation is the rating given to "the worst limitations[,]" it "does not necessarily mean a total lack or loss of ability to function." *Id*. While test scores are considered, "[n]o single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." *Id*. The analysis is a holistic one which considers how the child functions in every setting. 20 C.F.R. 416.926a(b).

If a claimant appeals the ALJ's decision to the district court, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id*. Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The reviewing court will not reweigh the evidence or substitute its own judgment in place of the ALJ's if there is substantial evidence to support the ALJ's determination. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

While this is a highly deferential standard, the ALJ's reasoning "must provide a 'logical bridge' between the evidence and his conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023) (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). When constructing this bridge, an ALJ must analyze all relevant evidence "and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). A "written evaluation of each piece of evidence or testimony is not required," but the ALJ must articulate "reasons for accepting or rejecting entire lines of evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## DISCUSSION

D.B. seeks reversal of the ALJ's judgment on the grounds that the ALJ: (1) erred in failing to consider the help and support D.B. received when determining the level of his impairments; (2) cherry-picked evidence; (3) failed to consider all aspects in the domain of caring for yourself; and (4) erred in her analysis of the listing requirements by not analyzing the section A and B requirements individually. The Court finds that the ALJ failed to build a logical bridge in three domains of functioning: (1) attending and completing tasks; (2) interacting and relating with others; and (3) caring for yourself. Therefore, this matter will be remanded for further proceedings consistent with this opinion.[3]

## I. Attending and Completing Tasks

The Social Security Regulations mandate that an ALJ must consider how independently a child can function compared to other children who do not have impairments. 20 C.F.R. § 416.924a(b)(5). While ALJs are not required to discuss every piece of evidence, they must at least

---

[3] Because the ALJ erred in analyzing at least three functional domains, it leaves open the possibility that D.B.'s condition functionally equals a listing. That is sufficient to require a remand. Although the Court did not reach the issues raised by the Plaintiff relating to analysis of the listing requirements, the ALJ should analyze these issues on remand.

address evidence that is contrary to their conclusion and explain why they came to an opposite result. *Herron*, 19 F.3d at 333. Here, when considering the domain of attending and completing tasks, the ALJ failed to discuss the numerous accommodations D.B. needed to function in school. Indeed, D.B. required a small group setting in a separate special-needs classroom for 50% of the day while being monitored every five minutes for behavior as well as repeated explanations and reminders along with immediate rewards. The ALJ did not discuss how any of those accommodations impacted D.B.'s ability to be independent.

The ALJ primarily relied on three pieces of evidence that show D.B. had less than a marked limitation in this domain: (1) reports that his hyperactive behavior had diminished; (2) his report card for third grade showed Bs and Cs; and (3) his "appropriate" behavior at the hearing. However, the ALJ did not create a logical bridge to support her reasoning. While Chiquita reported that calls from the school decreased and O'Hara-Fisher noted D.B. was calmer after taking his medication, both the May 2018 IEP and June 2018 teacher questionnaire still listed a slew of highly distracted behaviors engaged in by D.B. that warranted an increase in the amount and intensity of accommodations related to completing tasks. The ALJ failed to comport these reports from the teacher and the school where D.B. spent a good portion of his time with her conclusion of overall diminished hyperactivity due to increased medication.

Likewise, the ALJ noted D.B.'s report card with improved grades but did not analyze how the assistance D.B. received through the IEP might have affected those scores. The intensive accommodations provided to D.B. included being separated from peers, receiving extra reminders, and being checked on every five minutes. The regulations make clear that more limited independence must be taken into consideration when weighing whether a child has a marked limitation in a domain. The ALJ did not do that.

Finally, the ALJ improperly placed too much emphasis on D.B.'s behavior at the hearing. The regulations mandate that no inferences should be drawn about "functioning in other situations based only on how you function in a one-to-one, new, or unusual situation." 20 C.F.R. § 416.924a(b)(6). An administrative hearing would seem to qualify as a new or unusual situation. *See S.K. by next friend King v. Colvin*, No. 14 C 5868, 2016 WL 6070177, at *9 (N.D. Ill. Oct. 17, 2016) (finding that consultative examinations were a new or unusual setting). D.B.'s behavior while testifying is not necessarily indicative of how he is able to attend or complete tasks in any other setting.

## II. Interacting and Relating with Others

The ALJ describes this section as the "domain represent[ing] the greatest area of inconsistency in the record" because the behavior reports in 2017 described D.B. as being able to make friends and be respectful, while later reports and testimony from 2018 asserted that D.B. did not have any friends and had difficulties with aggression towards adults and peers. Once again, the ALJ failed to create a logical bridge to support her conclusion that these reports are inconsistent.

The ALJ contrasted testimony from D.B.'s mom about receiving fewer calls from school in 2018 after D.B. started medication with D.B.'s teacher's June 2018 questionnaire detailing aggression, fighting, and trouble taking turns. The ALJ deemed those statements inconsistent by inappropriately cherry-picking the evidence, though. Although there is evidence in the record to suggest that the medication helped D.B., there is also evidence in the record that he continued to struggle in his interactions with others. Both the May 2018 IEP and June 2018 teacher questionnaire reflect those ongoing challenges. And Chiquita testified that the school continued to communicate with her that D.B. still had serious difficulties interacting with others. The ALJ

improperly ignored this evidence entirely and made no attempt to articulate how it reflected an inconsistency.

In fact, at one point, the ALJ cited the two different IEPs completed two years apart in one sentence to bolster her conclusion that D.B. did not have a marked limitation in interacting and relating with others. (R. at 28-29) ("The claimant is described as a friendly social student who is liked by his peers and is respectful and honest in the classroom, as well as silly and energetic.") The 2016 IEP described D.B. as "a friendly social student who is liked by his peers" and is respectful and honest in the classroom, long before any other reports mentioned D.B. being aggressive and struggling to control his anger. The 2018 IEP similarly described D.B. as "silly and energetic," but then mentioned him having difficulty keeping his hands to himself, fighting, and not respecting adults. The ALJ inappropriately combined two introductory comments from different IEPs to create a picture of a child who did not have a marked limitation in interacting and relating with others.

### III. Caring for Yourself

The Court agrees with Plaintiff that the ALJ did not properly analyze the domain of caring for yourself. The ALJ only considered part of this domain. Social Security regulations provide that caring for yourself "includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety." 20 C.F.R. § 416.926a(k). In other words, this domain comprises physical needs "such as feeding, dressing, toileting, and bathing" but also the ability to "employ effective coping strategies, appropriate to your age, to identify and regulate your feelings." 20 C.F.R. § 416.926a(k).

The ALJ focused on D.B.'s physical needs and abilities in her findings, relying on the fact that "the claimant was noted as dressing and bathing independently. He assisted with putting away toys. The claimant is also described as sleeping and eating well. There was no suggestion that he did not pursue enjoyable activities." (R. at 30). Although the ALJ briefly mentioned the 2018 teacher questionnaire raised serious concerns about D.B.'s ability to care for himself, she dismissed them because "the record does not otherwise support such a finding." (R. at 30). As the Court has already discussed, the ALJ's discounting of O'Hara-Fisher's questionnaire is not explained thoroughly enough to build a logical bridge, particularly since the 2018 IEP is rife with consistent descriptions of D.B. struggling to regulate his emotions, deal with transitions, and exercise control over his urges independently. In addition, McKinley intake forms from February 2018 and treatment plan from July 2018 note D.B.'s difficulties with emotional regulation, asking for help, and outbursts or tantrums. The ALJ failed to address how any of this evidence is inconsistent with the assertions in the 2018 teacher questionnaire about D.B.'s functioning in this domain.

The Court is mindful that it cannot substitute its own judgment in place of the ALJ's. Nevertheless, the Court is unable to conduct a meaningful review because the ALJ failed to build a logical bridge between the evidence in the record and her ultimate findings.

## **CONCLUSION**

For the reasons discussed above, Plaintiff's Motion for Summary Judgment [24] is granted, and the Commissioner's Motion for Summary Judgment [31] is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order.

**DATED**: August 10, 2023　　　　　　　　　　**ENTERED**:

　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　LaShonda A. Hunt
　　　　　　　　　　　　　　　　　　　　　　United States District Judge